UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

STEPHEN JOSEPH ROGERS,

                   Plaintiff,

      -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                  Defendant.

-------------------------------------------------------X

*No objections to this Report and Recommendation (the "R&R") have been received. I review it for clear error and find none. Accordingly, the R&R is adopted as the decision of the Court. The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 11, 13), and remand the case to the Commissioner of Social Security for further proceedings consistent with the R&R.*

**REPORT AND
RECOMMENDATION**

15 Civ. 3921 (CS)(PED)

**SO ORDERED.**

*Cathy Seibel*

CATHY SEIBEL, U.S.D.J.

TO THE HONORABLE CATHY SEIBEL, United States District Judge:

*September 6, 2016*

## I.  INTRODUCTION

Plaintiff Stephen Joseph Rogers brings this action pursuant to 42 U.S.C. § 405(g) challenging the decision of the Commissioner of Social Security (the "Commissioner") denying his application for benefits on the ground that he was not disabled within the meaning of the Social Security Act (the "SSA"), 42 U.S.C. §§ 423 *et seq.*  The matter is before me pursuant to an Order of Reference entered October 21, 2015.  (Dkt. 7.)  Presently before this Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Dkt. 11 (plaintiff's motion), 12 (plaintiff's memorandum of law in support), 13 (defendant's motion), 14 (defendant's memorandum of law in support), 15 (plaintiff's reply memorandum of law in support), and 16 (defendant's reply memorandum of law in support)).  For the reasons set forth below, I respectfully recommend that defendant's motion be **DENIED**, and that plaintiff's motion be **GRANTED** to the extent that the case is **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/15/16

## II. BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration (Dkt. 6), filed by defendant in conjunction with the Answer. (Dkt. 5.)

A.    Application History

Plaintiff was born on February 12, 1977 with cerebral palsy. (R. 141, 157, 172.) He graduated from college and obtained a master's degree in journalism. (R. 35, 42, 158.) From 1993 through 2001, he worked as a tennis court attendant during the summers, and from 1999 to 2001, he worked as a freelance reporter. (R. 158, 178.) He had a prior claim for Disability Insurance Benefits from July 28, 2000, which terminated on March 2004. (R. 154.) From October 2001 through June 30, 2011, plaintiff worked in the accounting department of a brokerage firm co-owned by his cousin, in a position he described as an "accounting assistant" or an "office worker in investment firm." (R. 29-31, 157, 179, 184.) Plaintiff was laid off when the firm downsized due to financial difficulty, at which point plaintiff unsuccessfully searched for employment and applied for unemployment benefits with the Department of Labor. Plaintiff told the Department of Labor that he was able to work and testified that he could perform a job in an office doing data entry. (R. 29-32-36, 157, 184.)

On June 19, 2012, plaintiff filed a Title II application for a period of disability and disability insurance benefits alleging disability beginning June 30, 2011, the date he was laid off from his job at the brokerage firm, due to cerebral palsy, muscular imbalance, paralyzed palate (speech impairment), hearing loss, and vision loss. (R. 9, 11, 157.) His claim was denied initially on October 24, 2012. (R. 82-86.) Thereafter, plaintiff filed a written request for a hearing before an administrative law judge ("ALJ"), which was held on October 29, 2013 in White Plains, New York. (R. 26-75.) At the hearing, vocational expert Michael Smith appeared

and testified via teleconference.  Plaintiff's father, Stephen Rogers, Sr., testified as well.  On

December 31, 2013, plaintiff's claim was administratively denied.  (R. 6-21.)  The ALJ's

decision became the final order of the Commissioner on March 27, 2015, when the Appeals

Council denied plaintiff's request for review.  (R. 1-5.)  Plaintiff timely filed this action on May

21, 2015.  (Dkt. 1.)

B.    Treating Sources

        The administrative record contains various medical and other treatment records.  The

following is a distillation of their relevant points.

        1.    Dr. Sally Jordan, M.D.

        During the relevant period, plaintiff received treatment from ophthalmologist Dr. Sally

Jordan, for purposes of completing disability paperwork.  (R. 160-65, 199, 232, 270.)  In an

August 15, 2011 report prepared for the Office of Vocational and Educational Services for

Individuals With Disabilities, Dr. Jordan noted that plaintiff's distance visual acuity in the right

eye was 20/400 without correction and 20/70 with correction.  Plaintiff's visual acuity was "J2,"

or nearly normal for reading, which reflects an 8.5 percent loss, with and without correction in

the right eye.  (R. 230.)  Plaintiff's left eye had CF (counting finger) vision for distance and

reading with and without correction, representing a 98% vision loss in that eye.[1]  (Id.)  Dr.

Jordan opined that plaintiff had restricted visual field and muscle function, and no depth

_____

        [1] Counting fingers would be safely interpreted as legal blindness since it indicates that the
individual could not see the standard measurement at 20 feet.  See Wedge v. Shawmut Design &
Const. Grp. Long Term Disability Ins. Plan, 23 F. Supp. 3d 320, 326 n.4 (S.D.N.Y. 2014) (citing
Wendy Strouse Watt, O.D., "How Visual Acuity is Measured,"
http://lowvision.preventblindness.org/eye-conditions/how-visual-acuity-is-measured. ("It is
common to record vision worse than 20/400 as Count Fingers (CF at a certain number of feet. . .
. Legal Blindness is when a person's best-corrected vision is 20/200 or worse.")).

perception. (R. 230-31.) Plaintiff's congenital eye pathology included esotropia[2], left hypertropia[3], coloboma of the retina[4], iris anomaly, ptosis[5], visual field defects, and bilateral cataracts. (R. 231.)

Dr. Jordan completed an examination on January 22, 2011 for the Department of Motor Vehicles ("DMV"). (R. 233.) She recorded plaintiff's visual acuity as 20/50 and 20/400 and indicated that his vision was 20/40 when both eyes were tested together. (Id.) She noted no visual field defects or other findings in that examination. (Id.)

In a letter dated December 12, 2012, Dr. Jordan stated that she had been treating plaintiff since December 1998 and was aware of his impairments including congenital vision, hearing, speech, and gross motor skills. She noted that plaintiff demonstrates amblyopia[6], esotropia, left hypertropia, and nystagmus[7]. Dr. Jordan stated that she had treated plaintiff one day earlier, and that his parents told her that plaintiff's impairments affected his ability to complete tasks and work assignments, and caused him to lose his job. (R. 270.) Dr. Jordan opined that plaintiff

---

[2] Esotropia is a term used to describe crossed eyes. See American Association for Pediatric Ophthalmology and Strabismus, available at https://www.aapos.org/terms/conditions/9.

[3] Hypertropia is vertical eye misalignment, causing an eye to be higher than normal. See American Association for Pediatric Ophthalmology and Strabismus, available at https://www.aapos.org/terms/faqs/14.

[4] Coloboma is a hole or defect which may cause blurred vision, decreased visual acuity, double vision, or ghost image. See MedlinePlus, available at https://medlineplus.gov/ency/article/003318.htm.

[5] Ptosis is a drooping of the upper eyelid. See American Academy of Ophthalmology, available at http://www.aao.org/eye-health/diseases/what-is-ptosis.

[6] Amblyopia the loss of the ability to see clearly through one eye. It is also called 'lazy eye." MedlinePlus, available at https://medlineplus.gov/ency/article/001014.htm.

[7] Nystagmus is a term to describe fast, uncontrollable movements of the eyes. See MedlinePlus, available at https://medlineplus.gov/ency/article/003037.htm.

should be eligible for disability benefits because his impairments negatively affected his ability to carry out day-to-day chores in the workplace, and noted that plaintiff was unable to concentrate and sit still for the eye examination.  (Id.)

2.   Dr. John Carway, PhD

Psychotherapist Dr. John Carway, PhD saw plaintiff six times between September 17 and October 15, 2013.  (R. 97, 271, 277-83.)  Dr. Carway noted that plaintiff "manifested a great deal of frustration in explaining his situation" and was restless after forty minutes.  (R. 277-78.)  Dr. Carway believed that plaintiff was "concealing his emotions with an attempt at being reasonable, as though he thought it wasn't right for him to feel this way."  (R. 277.)  Dr. Carway noted that plaintiff "tries not to dwell on his disabilities" and though he "can get upset," he "doesn't want to . . . be 'consumed' by it."  (Id.)  Dr. Carway opined that plaintiff had problems concentrating and that plaintiff tried to "cover[] up his true feelings," and noted that he had difficulty understanding plaintiff's speech.  (R. 278, 281.)

Plaintiff explained to Dr. Carway that he "doesn't want any pity" with regard to his speech problems, and that he would prefer a person who does not understand him to "simply say, 'I didn't get that,'" rather than pretend to understand plaintiff.  (R. 279.)  Dr. Carway noted that plaintiff's "point was that he could handle it."  (R. 280.)  Plaintiff was "very aware of the discrepancy between what he thinks he can do and what job placement people have to offer," but noted that plaintiff continued to search for jobs through "the internet, the newspapers . . . follow[ing] tips and job counselors."  (R. 280.)  "Asked about how he sees his future, his first response is getting a job" because he "fears . . . he may be totally dependent on his parents."  (R. 282.)

In an October 11, 2013 functional assessment, Dr. Carway diagnosed plaintiff with

-5-

dysthymic disorder.  Among the symptoms Dr. Carway identified were poor memory, personality change, mood disturbance, emotional lability, loss of interests, and feelings of guilt/worthlessness.  (R. 271.)  In response to a prompt to describe clinical findings, including results of mental status examinations, that supported plaintiff's mental impairments and symptoms, Dr. Carway wrote that "during sessions impaired speech, hearing and attention made it difficult, causing much repetition and shortening of sessions" and did not note any mental status examination.  (R. 272.)  Dr. Carway noted that plaintiff's psychiatric condition exacerbated his pain, as there is a "constant feedback of mood and affect on daily activities.  For example, frustration inhibits performance and leads to outbursts of anger."  (R. 272-73.)  Dr. Carway denied that plaintiff had any difficulty with intellectual functioning, delusions, illogical thinking, or oddities of thought, perception, or behavior.  (R. 271.)

Dr. Carway opined that plaintiff had substantial to complete loss of mental abilities needed to do unskilled work in 18 functional areas, including understanding and remembering very short and simple instructions, working in coordination with or proximity to others without being unduly distracted, accepting instructions and responding appropriately to criticism from supervisors, and dealing with normal work stress, but opined that plaintiff had fair ability to understand and remember very short and simple instructions and maintain regular attendance and be punctual.  (R. 274.)  Dr. Carway checked that plaintiff's ability to carry out very short and simple instructions was both "fair" and "poor/none."  (Id.)  Dr. Carway opined that plaintiff's "function is severely impacted by his organic problems which severely impede all his functioning," and indicated that plaintiff's functional limitations were all extreme.  (R. 275-76.)  Dr. Carway also opined that plaintiff had extreme limitations in activities of daily living and social functioning, deficiencies of concentration, persistence, and pace, and continual episodes of

decompensation. (R. 275.) Dr. Carway noted that plaintiff's "attention span is limited" and concluded that "it is obvious that the cerebral palsy has brought on . . . impairments of such a nature as to lead to distractibility, mood shifts, frustration and anger."

C.   Consultative Examinations

1.   Dr. Mark Johnston, MD

SSA consultative examiner Dr. Mark Johnston, MD, performed a neurological examination of plaintiff on August 28, 2012. (R. 244-47.) Dr. Johnston interviewed both plaintiff and his father, who appeared at the examination. Dr. Johnston reported that plaintiff sustained injuries at birth and that, due to paralysis of the palate, plaintiff's voice had a nasal quality which made it difficult for Dr. Johnston to understand him. Dr. Johnston reported that plaintiff had worked for ten years with accommodations for a family member in an office position, but that plaintiff had been unable to find work since the office closed due to speech difficulties. Plaintiff reported bilateral colobomas resulting in decreased vision, left greater than right, and bilateral hearing loss since infancy, but plaintiff was able to hear fairly well with a hearing aid in his right ear. Plaintiff reported only driving locally due to his vision and hearing difficulties, and stated that he could walk and run normally, cook, clean, do laundry, shop, and groom himself independently. (R. 244-45.)

Dr. Johnston's examination records reveal that plaintiff had 20/50 corrected visual acuity in the right eye and 20/70 in the left eye, with 20/70 vision when both eyes were tested together on a Snellen chart at 20 feet. A whitish lesion covered the optic disc of plaintiff's right eye, and he had a cataract in his left eye. Plaintiff had a marked horizontal nystagmus with the left lateral gaze, and no left or right field defect. (R. 245-46.)

Plaintiff's gait and station, spine, extremities, hands, and sensation were normal.

Plaintiff was dressed appropriately, maintained appropriate eye contact, appeared orientated, and exhibited no signs of delusions, hallucinations, impaired memory, insight, or judgment. His mood and affect were appropriate. (R. 245-46.)

A "mini mental status" exam revealed "no evidence of delusions . . . no indication of recent or remote memory impairment," appropriate mood and affect, and "no suggestion of impairment in insight or judgment." (R. 426.) Dr. Johnston diagnosed a history of cerebral palsy, dysarthria[8], bilateral hearing loss, coloboma of the right eye, cataract or the left eye, and nystagmus, and opined that plaintiff's speech and vision were moderately limited, and that plaintiff's mild hearing[9] limitation was partially compensated with a right hearing aid. (R. 247.) Dr. Johnston recommended an ophthalmologic evaluation to characterize the extent of plaintiff's visual limitation. (Id.)

2.    Dr. Seema Rathi, M.D.

Ophthalmologist Dr. Seema Rathi examined plaintiff for the SSA and issued a report on August 29, 2012. Dr. Rathi reported that plaintiff's visual acuity for distance was 20/70 in the right eye and with correction, 20/40 for distance and reading. Dr. Rathi noted that plaintiff was CF in the left eye with and without correction. Plaintiff had no afferent pupillary defect and full extraocular muscle movements. The anterior segment showed normal lids, conjunctiva, and cornea. Plaintiff had anterior cortical cataracts in both eyes and coloboma of the choroid and

---

[8] "Dysarthria is a condition in which the muscles you use for speech are weak or you have difficulty controlling them." Mayo Clinic, available at http://www.mayoclinic.org/diseases-conditions/dysarthria/basics/definition/CON-20035008.

[9] Although Dr. Johnston writes that plaintiff "mild limitation of *learning*" is compensated by a hearing aid, Dr. Johnston presumably intended to say "mild limitation of *hearing*." (R. 247).

retina inferiorly in both eyes.  Plaintiff had full field of vision in the right eye, and responses superiorly in the left.  Dr. Rathi opined that plaintiff would not be able to perform normal visual tasks, though she did provide a further description of what normal visual tasks entailed.  (R. 249-51).

       3.     Dr. Steven Goldstein

On October 15, 2015, otolaryngologist Dr. Goldstein performed an audiometric evaluation and found that plaintiff had bilateral hearing loss, with profound loss in the left ear and moderate to severe loss in the right ear, for which he used a hearing aid.  Plaintiff reported that he was doing well with the hearing aid.  The audiograms revealed 96% speech discrimination in the right ear and no response in the left ear.  (R. 255-58.)

       4.     Dr. D. White

Non-examining consultant Dr. White, an internist, issued a report on October 23, 2012 at the request of the SSA.   After a review of the record, Dr. White opined that plaintiff's Residual Functional Capacity ("RFC") was for work that did not require excellent visual acuity, depth perception, full field of vision, critical ratings for hearing or speaking, constant or prolonged exposure to loud noise, or exposure to unprotected heights or hazards.  Dr. White's report did not explain how plaintiff's impairments led him to determine this RFC.  (R. 261.)

D.    Non-Medical Evidence

       1.     Plaintiff's Testimony and Self-Report

Plaintiff testified that he worked at a bookkeeping type of job, with accommodations, from October 2001 through June 2011 for his cousins' business.  (R. 30-32.)  He received his master's in journalism from Iona, and could not recall whether he used accommodations in that program.  (R. 43.)  He testified that he was able to read a sign three feet away from him and did

not need to strain his eyes.  (R. 41, 45.)  He stated that he could read well enough to work on a computer.  (R. 39-40, 55.)  Plaintiff testified that he had a drivers' licence, and he drove in emergencies.  (R. 39-40.)  He could hear at work with the use of a hearing aid, and had no trouble hearing at the administrative proceeding.  (R. 44.)  He testified that due to his limited concentration, sometimes he worked additional hours to complete his work.  (R. 36-37, 42.)

In a Function Report, plaintiff stated that he did not have trouble with stress, changes in schedule, paying attention or remembering things, following instructions, or getting along with others.  He reported enjoying going to the gym and the library, and surfing the internet, watching television, and watching sports.  He socialized, went to movies, sporting events, social groups, and church, and went outside every day by walking or using public transportation.  He reported caring for personal needs by shopping, cooking, cleaning, performing household chores, and doing yard work.  His abilities to perform activities or interact had not changed.  (R. 168-176.)

2.    Kevin Heneghan

Kevin Heneghan was the Senior Managing Director of OTA Financial, the accounting firm where plaintiff worked for ten years, and is plaintiff's cousin.  Mr. Heneghan submitted a letter dated September 4, 2013, which stated that plaintiff interned at OTA during college and was hired after applying for a permanent full time position on October 8, 2011.  Mr. Heneghan stated that plaintiff accepted a buy-out termination offer when the firm reduced its workforce, and that OTA helped plaintiff search for another job.  Mr. Heneghan described plaintiff's group at OTA as responsible for collecting the revenue generated by the firm and dispensing monies to pay for incurred expenses.  Mr. Heneghan stated that plaintiff received accommodations at the firm including reassignment of some tasks when clients, customers, and vendors had difficulty communicating with plaintiff.  Mr. Heneghan wrote that plaintiff's eyesight caused him

difficulty reading and it took him longer to complete tasks, such as reading office and external email communications.  Mr. Heneghan praised plaintiff for being popular and admired by his coworkers, having impressive determination and commitment, for always being punctual and accepting new tasks eagerly, for receiving criticism and instruction, and for never shrinking from responsibility, even though plaintiff had some emotional outbursts.  Mr. Heneghan opined that plaintiff's impairments would handicap his ability to "hold down a job in the normal workplace." (R. 267-68.)

       3.    <u>Ruth Baruch, M.S., C.R.C.</u>

Vocational consultant Ms. Baruch interviewed plaintiff and his parents and reviewed some record evidence as part of a vocational assessment in August or September, 2013.  Plaintiff reported to Ms. Baruch that he took longer than average to complete tasks, that he had vision, speech, and hearing deficits, and that he had motor skill difficulties.  Plaintiff reported that he watched television, went to the library and spent two hours at the gym daily, that he used the computer, and that he enjoyed watching sports, writing, and going out with friends.  Plaintiff stated that he drove locally but avoided highway and night driving due to his vision problems. Plaintiff told Ms. Baruch that he worked for his cousin at OTA from October 2001 through June 2011 in the accounts payable department, performing data input, reconciliation of accounts, and social networking.  Plaintiff reported that he lost his job due to company layoffs and did not state that he received any accommodations at work.  Ms. Baruch classified plaintiff's past work as an accounts receivable clerk, Job Code No. 216.482-010 in the Dictionary of Occupational Titles ("DOT") (4th ed. Rev's 1991), which is a sedentary and skilled position.  (R. 263-266.)

Plaintiff's parents told Ms. Baruch that plaintiff faced many difficulties at work, had accommodations, and could not perform competitive gainful employment – a "very different"

story than what plaintiff told Ms. Baruch. Ms. Baruch "opined that many accommodations were created . . . that would not be considered reasonable by any other employer," and requested a letter from OTA Financial. Ms. Baruch relied on the interviews of plaintiff's parents and reports from Dr. Jordan and OTA Financial, not plaintiff's interview, in forming her opinion. (R. 263-266).

      4.     Stephen Rogers, Sr.

Stephen Rogers, Sr., plaintiff's father, testified at the hearing that, though he was never told why plaintiff was laid off from OTA, he believes one of the reasons was plaintiff's difficulty concentrating. (R. 56, 58.) Plaintiff's father stated that during college, plaintiff had accommodations and that he has emotional outbursts from frustration while in the office or at home. (R. 60.) Plaintiff's father opined that Mr. Heneghan hired plaintiff to work as an "accommodation job because of the relationship" and that plaintiff's impairments would prohibit him from working at another job, even though plaintiff believed he was capable of working. (R. 47-48, 51, 55, 60.) Mr. Rogers testified that plaintiff was unable to do yard work aside from holding a bag open for leaves, and was only capable of making a sandwich if ingredients were laid out for him. (R. 52-53.)

      5.     Vocational Expert Mike Smith

Vocational Expert Mike Smith testified at the administrative hearing that a hypothetical person who could perform work at all exertional levels, except could not perform jobs that required depth perception, would have difficultly communicating with others due to a speech impairment, and could not perform jobs requiring a high level of hearing but could understand human voices and environmental sounds, could perform plaintiff's past job as a brokerage clerk, which is classified as skilled sedentary work. Mr. Smith testified that the hypothetical person

-12-

could perform jobs as a credit card clerk, scale operator, and garment steamer.  (R. 62-73.)

## III.  LEGAL STANDARDS

A.    Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'"  Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)).

The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard."  Brault v. Social Sec. Admin, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence.  See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Lamay v. Commissioner of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir.

2012) (internal quotation marks and citation omitted).  "When there are gaps in the

administrative record or the ALJ has applied an improper legal standard," or when the ALJ's

rationale is unclear in light of the record evidence, remand to the Commissioner "for further

development of the evidence" or for an explanation of the ALJ's reasoning is warranted.  Pratts

v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

B.      Statutory Disability

        A claimant is disabled under the SSA when he or she lacks the ability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  In

addition, a person is eligible for disability benefits under the SSA only if

> his physical or mental impairment or impairments are of such severity that he is
> not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

        A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step

sequential analysis:

1.      The Commissioner considers whether the claimant is currently engaged in
        substantial gainful activity.

2.      If not, the Commissioner considers whether the claimant has a "severe
        impairment" which limits his or her mental or physical ability to do basic
        work activities.

3.      If the claimant has a "severe impairment," the Commissioner must ask
        whether, based solely on medical evidence, claimant has an impairment
        listed in Appendix 1 of the regulations.  If the claimant has one of these

enumerated impairments, the Commissioner will automatically consider
him disabled, without considering vocational factors such as age,
education, and work experience.

4.  If the impairment is not "listed" in the regulations, the Commissioner then
asks whether, despite the claimant's severe impairment, he or she has
residual functional capacity to perform his or her past work.

5.  If the claimant is unable to perform his or her past work, the
Commissioner then determines whether there is other work which the
claimant could perform.

Rolon v. Commissioner of Soc. Sec., No. 12 Civ. 4808, 2014 WL 241305, at *6 (S.D.N.Y. Jan.

22, 2014); see 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v).  The claimant bears the

burden of proof as to the first four steps of the process.  See Green-Younger v. Barnhart, 335

F.3d 99, 106 (2d Cir. 2003).  If the claimant proves that his impairment prevents him from

performing his past work, the burden shifts to the Commissioner at the fifth and final step.  See

id.; 20 C.F.R. § 404.1560(c)(2).  At the fifth step, the Commissioner must prove that the

claimant is capable of obtaining substantial gainful employment in the national economy.  See

Butts v. Barnhart, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

## IV.  THE ALJ'S DECISION

The ALJ properly applied the five-step sequential analysis described above and

concluded that plaintiff was not disabled under the meaning of the SSA.  (R. 9-21.)  At step one,

the ALJ determined that plaintiff had performed substantial gainful activity since the alleged

onset date until the second quarter of 2012, as plaintiff earned $17,750, $7,785, and $7,750 in the

third and fourth quarter of 2011 and the first quarter of 2012, respectively.  (R. 11.)  The ALJ

concluded that plaintiff had not engaged in Substantial Gainful Activity since the first quarter of

2012.  The ALJ concluded that, in any event, plaintiff would be determined "not disabled" even

if he did not perform Substantial Gainful Activity since the alleged onset date.  (Id.)

-15-

At step two, the ALJ concluded that plaintiff's cerebral palsy and vision, speech, and hearing impairments constituted "severe impairments" within the meaning of the SSA. (R. 11-12.) However, the ALJ determined that plaintiff's mental impairment of dysthymic disorder did not cause more than minimal limitation in his ability to perform basic mental work activities and is therefore not severe. (R. 12.)

At step three, the ALJ determined that plaintiff's impairments (individually or combined) did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 14.)

Next, the ALJ determined that plaintiff had the RFC "to perform a full range of work at all exertional levels but cannot perform jobs requiring significant oral communication with the public or with co-workers due to his speech impediment and hearing loss; however, he is capable of hearing/understanding human voices and general sounds in the environment with the use of hearing aid. He would not be able to perform jobs that require depth perception due to blindness in one eye." (R. 14.)

At step four, the ALJ determined that plaintiff "is capable of performing past relevant work as a brokerage house clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)." (R. 19.)

At step five, the ALJ determined that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)," and that "[i]n the alternative, considering the claimant's age, education, work experience, and residual functional capacity, there are other jobs that exist in significant numbers in the national economy that the

claimant also can perform (20 CFR 404.1569 and 404.1569(a))." (R. 20.) The ALJ concluded that plaintiff had not been "disabled" under the SSA. (R. 21.)

## V.  ASSESSING THE ALJ'S FINDINGS

Plaintiff challenges the Commissioner's decision a number of grounds, including that the ALJ improperly excluded most evidence and that which remains is not substantial, and that a proper evaluation of the evidence requires a remand for further hearing and development of the record. (Plaintiff's Memorandum of Law ("Pl. Mem."); Plaintiff's Reply Memorandum of Law ("Pl. Reply")).

Defendant maintains that the ALJ's decision "is legally correct and supported by substantial evidence." (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Def. Mem.") at 13; Reply Memorandum of Law in Further Support ("Def. Reply")).

A.     The RFC Determination

    1.     Medical Sources

        a.     Dr. Jordan

Plaintiff claims that the ALJ's analysis fails to follow the treating physician rule. (Pl. Mem. at 13.) Defendant argues that the ALJ properly applied the treating physician rule in discounting the medical opinion of Dr. Jordan, the only treating source. (Def. Mem at 19.)

In considering any medical opinions set forth in the administrative record, the ALJ must give controlling weight to the opinion of a treating physician if it is well-supported by the medical record and is not inconsistent with other substantial record evidence. See Green-Younger, 335 F.3d at 106; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). A "treating source" is a claimant's "own physician, psychologist, or other acceptable medical source who provides [the

claimant], or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502.

When the treating physician's opinion is not given controlling weight, the ALJ must determine the amount of weight to be assigned to the treating source's opinion based upon consideration of the following factors: (1) the length, nature and extent of treatment and the frequency of examination; (2) the relevant evidence presented by the treating source in support of his opinion; (3) whether the opinion is consistent with the record as a whole; (4) whether the treating source is a specialist in the area relating to his opinion; and (5) other factors which tend to support or contradict the opinion. See Shaw, 221 F.3d at 134; 20 C.F.R. § 404.1527(d)(2)-(6). The ALJ need not recite each factor explicitly, provided the ALJ's decision reflects substantive application of the regulation. See Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."). However, an ALJ's failure to set forth "good reasons" for the weight accorded to a treating source opinion is a ground for remand. See Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).

Here, the ALJ addressed Dr. Jordan's opinion as follows:

[Dr. Jordan] further asserted that in addition to his visual abilities, the claimant has significant speech and hearing impediments, which would negatively affect his ability to carry out day to day chores especially in a work setting. Dr. Jordan also stated that the claimant lacks the ability to concentrate for any length of time - but there is no objective medical evidence to sustain this conclusion, which was based solely on the advice **by the claimant's parents** that his ability to complete tasks and work assignments eventually caused him to lose his job - which is, of course, inconsistent with the claimant's admission that he lost his job due to "downsizing" rather than poor performance.

Dr. Jordan concluded that the claimant was "disabled" due to the aforementioned impairments. The undersigned cannot give any evidentiary weight to this opinion. Dr. Jordan, of course, is not a vocational expert who is

-18-

> competent to make this determination.  Dr. Jordan is the claimant's treating eye
> doctor who has no overall knowledge of the claimant's work capabilities.  For
> example, the physician has made no examination of the claimant's motor skills.
> The opinion also does not take into account that the claimant has been authorized
> to operate a motor vehicle- which can only have been approved by Dr. Jordan's
> report to the Department of Motor Vehicles.  Whether the claimant is "disabled"
> is, of course, a determination reserved to the Commissioner (20 CFR 404.1527(e)
> and SSR 96-5p).

R. 17 (emphasis in original).

The ALJ conducted a thorough review of the medical evidence that he states fails to

support the opinion of Dr. Jordan, who only saw plaintiff twice during the relevant time period.

(Id.)  The ALJ's above articulation demonstrates that he applied the substance of the treating

physician rule and amounts to "good reason" for the weight the ALJ accorded Dr. Jordan's

opinion.

b.   Dr. Rathi

Plaintiff argues that the ALJ improperly gave "no weight to the opinion of his own

treating specialist, Dr. Rathi, that Plaintiff 'will not be able to perform normal visual tasks

although her underlying findings supporting the opinion are identical with those of the treating

specialist, Dr. Jordan!"  (Pl. Mem. at 12.)  Defendant contends that the "ALJ appropriately

rejected the opinion of consultative examiner Dr. Rathi that plaintiff could not perform normal

visual tasks, since it was inconsistent with other evidence . . . that plaintiff could perform many

normal visual tasks."  (Def. Mem. at 20.)  Defendant adds that in fact, Drs. Jordan and Rathi's

findings were not identical, in that they "differed with respect to visual acuity, visual field, depth

perception, and muscle function" but that regardless, "the ALJ reasonably discounted them as

conflicting with other evidence."  (Id. & n.10)

The ALJ summarizes the findings of plaintiff's consultative eye examination with Dr.

Rathi from August 2012.  He concludes that he could not accord any evidentiary weight to Dr.
Rathi's opinion that plaintiff would not be able to perform normal visual tasks, because the
"objective medical evidence does not demonstrate that the claimant's vision has deteriorated
since his alleged onset date, prior to which he was able to steadily work for 10 years as a
brokerage clerk, performing clerical work and bookkeeping duties which often required him to
use a computer.  These activities require normal visual capabilities."  (R. 16.)

     Dr. Rathi is not a treating physician because, despite plaintiff's characterization of her as
a "treating specialist;" she examined plaintiff for the SSA on only one occasion.  (R. 249-51.)
As such, her opinion is not entitled to controlling weight, and the ALJ's decision to give no
weight to Dr. Rathi's ultimate opinion after a thorough analysis was not erroneous.

        c.     Dr. Carway and Plaintiff's Self-Report

     Plaintiff argues that the ALJ erred in failing to give appropriate weight to Dr. Carway's
findings, including that plaintiff's "panoply of symptoms . . . make employment impossible,"
and in concluding that plaintiff's dysthymia was not severe.  (R. 12-13, 273; Pl. Mem. at 21.)
Defendant argues that the ALJ's discount of Dr. Carway's opinion was reasonable.  (Def. Mem.
at 20.)

     The ALJ stated that he

> cannot accord significant evidentiary weight to the opinions of Dr. Carway as
> they are based on a very brief treatment history and only relate to current opinion.
> It makes no longitudinal reference.  In addition, the opinion was given in a "check
> off" format with little narrative and no retrospective application.  The form is not
> at all consistent with the psychologist's treating notes which basically relate the
> subjective feelings of the claimant rather than clinical observations of limitations
> in mental functioning.  The treatment notes do not contain formalized mental
> status examinations or cognitive testing to provide support for the asserted
> limitations.

(R. 13.)  At the time of his letter, Dr. Carway had only been seeing plaintiff for one month.  (R.

9, 271, 277-83.)  Plaintiff concedes that "Dr. Carway cannot be considered a 'treating source' due to the recency of the relationship," and as such, the opinion was not entitled to controlling weight.  (Pl. Mem. at 20); Halloran v. Barnhart, 362 F.3d 28, 32 (2d. Cir. 2004).

Dr. Carway's report contradicts plaintiff's answers in the Function Report, in which plaintiff indicated that stress or changes in schedule do not affect him, that he never lost a job because of problems getting along with people, and that he has no problems getting along with bosses or other people in authority.  (R. 175-76.)  Plaintiff argues that the ALJ erred in "accepting . . . what the claimant said in his written function report, although the testimony and the notes of [Dr. Carway] confirm that Rogers is prone to exaggerating his own capability."  (Pl. Mem. at 12.)

The ALJ can appropriately reference plaintiff's admissions about his capabilities to support his RFC and credibility findings.  20 C.F.R. 404.1529; Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 113 (2d Cir. 2010) ("Generally speaking, it is the function of the ALJ, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.'") (internal citations omitted).  Though Dr. Carway noted that plaintiff tried to "cover[] up his true feelings," and that plaintiff was "aware of the discrepancy between what he thinks he can do and what job placement people have to offer," Dr. Carway did not, as plaintiff asserts, "confirm that Rogers is prone to exaggerating his own capability."  (R. 278, 280.)  In fact, Dr. Carway assessed that plaintiff had no delusions or hallucinations, oddities of thought, perception, speech or behavior, or illogical thinking.  (R. 271.)  Dr. Johnston's mini-mental status exam also noted "no evidence of delusions . . . " (R. 246.)  Dr. Carway's report is also inconsistent with the mini mental status exam conducted by Dr. Johnston, which reflects that plaintiff's mood and affect were appropriate.  (R. 246.)

Accordingly, the ALJ did not err in crediting plaintiff's own statements in his function report over Dr. Carway's conclusion.

       d.    Dr. Johnston

Plaintiff claims that the ALJ "is in error in accepting the opinion of Dr. Johnston over those of Dr. Rathi or Dr. Jordan." Plaintiff speculates that Dr. Johnston's finding that plaintiff had 20/70 corrected vision in his left eye must be mistaken, as Drs. Jordan and Rathi both found that plaintiff only had "counting fingers" vision of the left eye, indicating blindness. (Pl. Mem. at 12-13.) The ALJ stated:

> Dr. Johnston opined that the claimant had "moderate" limitations for vision and hearing and a mild limitation of hearing, which was partially compensated with a right hearing aide [sic]. Although the physician did not precisely defined [sic] the term "moderate," the undersigned accords substantial evidentiary weight to the opinions of the examiner as they are consistent with the overall medical record and the work history of the claimant. Overall, the examination did not demonstrate significant neurological deficits.

(R. 16.) First, the ALJ's summary of Dr. Johnston's medical source statement is mistaken, as is Dr. Johnston's statement itself. The ALJ states that Dr. Johnston opined that plaintiff had both a moderate and mild limitation for hearing, and did not mention Dr. Johnston's assessment of plaintiff's speech. Dr. Johnston stated that plaintiff has "moderate limitation of speech . . . a mild limitation of *learning*, which is partially compensated with his right hearing aid . . . [and] moderate limitation of vision." (R. 247 (emphasis added).) As Dr. Johnston's report does not appear to test for learning disabilities and his analysis of a "limitation of learning" is qualified by mention of a hearing aid, it is safe to assume that Dr. Johnston intended to write "hearing" where he wrote "learning." Accordingly, an accurate summary of Dr. Johnston's opinion is that plaintiff had a moderate limitations of vision and speech, and a mild limitation for hearing.

Regardless, the ALJ's RFC determination regarding plaintiff's vision unsupportable in

light of the ALJ's assessment of the medical evidence of record and the weight to which the ALJ

accords the various doctors' opinions.  Though the ALJ states that he accords substantial weight

to Dr. Johnston's opinion, the ALJ's RFC that plaintiff "would not be able to perform jobs that

require depth perception due to blindness in one eye" reflects the medical findings of Drs. Jordan

and Rathi that plaintiff had "CF" in his left eye, rather than Dr. Johnston's clinical finding that

plaintiff had corrected vision of 20/50 in his right eye and 20/70 in his left eye.  (R. 14.)

The ALJ's reliance on Dr. Johnston's ultimate conclusion that plaintiff had only

"moderate" visual limitation is illogical, considering that he explicitly disregards the medical

evidence upon which Dr. Johnston relied in reaching that conclusion.  The ALJ's pronouncement

that plaintiff is blind in one eye is all the more puzzling in light of the ALJ's rejection of the

conclusions of Drs. Rathi and Jordan – the sources upon which the ALJ must have relied for the

proposition that plaintiff is blind in one eye, considering the ALJ does not credit plaintiff's own

claim of blindness.  (R. 19 ("[T]he claimant is not a totally reliable witness. . . . While he claims

blindness in his left eye, he uses corrective glasses which enable him to perform activities.").)

The ALJ seemingly cherry-picks medical findings from Drs. Rathi and Jordan about plaintiff's

blindness in one eye, while rejecting other limitations revealed by their examinations (for

example, that plaintiff has a restricted visual field and muscle function).  (R. 230-31.)  The ALJ

then purportedly accepts the vague conclusion of Dr. Johnston that plaintiff's vision was

moderately limited, and mysteriously interprets that to conclude that plaintiff is limited to jobs

that do not require depth perception, which is belied by Dr. Johnston's own clinical findings.

Defendant offers that "it is within the ALJ's province to resolve conflicting evidence,

including by adopting some findings from a particular source while rejecting other findings from

that source."  (Def. Reply at 5.)  The cases that defendant cites for this proposition are inapposite

here, as neither address an ALJ who purportedly accepted a doctor's ultimate opinion while disregarding the medical findings that supported that same opinion in the RFC determination. See Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) ("remanding where the ALJ did not "'seek out clarifying information' concerning . . . perceived inconsistencies between [an individual doctor's] two reports"); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (finding that it is within the province of the ALJ to resolve two conflicting opinions of the same doctor).

Plaintiff also takes issue with the lack of specificity of Dr. Johnston's finding that plaintiff has only a "moderate limitation of vision," as Dr. Johnston gave "no functional or quantitative definition for his finding of a 'moderate' limitation of vision." (Pl. Mem. at 12-13.) As noted above, the ALJ acknowledged that Dr. Johnston did not precisely define the term "moderate," but nevertheless accorded substantial weight to his opinion because it was "consistent with the overall medical record and the work history of the claimant." (R. 16.)

Defendant is generally correct that "an opinion phrased in terms of 'moderate' limitations can support a RFC finding when other record evidence gives the opinion concrete meaning." (Def. Mem. at 16-17) (citing Rigano v. Astrue, No. 07 Civ. 10282, 2010 WL 6385381, at *24 (S.D.N.Y. Sept. 13, 2010) (report and recommendation adopted by 2011 WL 1406185 (S.D.N.Y. Mar. 30, 2011)). However, in this case, the ALJ interprets "moderate limitation of vision" to mean blindness in one eye – a finding that could not possibly give concrete meaning to Dr. Johnston's conclusion, as Dr. Johnston's own findings contradict the ALJ's interpretation of his conclusion.

Overall, the ALJ's illogical and confusing assessment of Dr. Johnston's opinion, in conjunction with his analysis of Drs. Jordan and Rathi and his ultimate RFC determination, is improper and warrants remand. As the Second Circuit explained in a related context:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable. A claimant . . . who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. See Jerry L. Mashaw, Due Process in the Administrative State 175–76 (1985).

Snell v. Apfel, 177 F.3d 128, 133-34 (1999).[10]  Here, although the ALJ gives reasons for according no evidentiary weight to the opinions of Drs. Rathi and Jordan and substantial evidentiary weight to Dr. Johnston's opinion, these reasons and the ALJ's intermediate conclusions in his decision do not comport with his ultimate RFC determination.  Plaintiff "might be especially bewildered" by the ALJ's RFC determination regarding his vision, because the Court is bewildered as well.[11]

On remand, the ALJ must give further explanation for adopting some findings of Drs. Rathi and Jordan (that plaintiff is blind in one eye), but rejecting the ultimate opinions of these doctors, while purportedly adopting the conclusions of Dr. Johnston, whose clinical findings the ALJ rejects.[12]  In expounding upon his interpretation of Dr. Johnston's opinion regarding

---

[10] This discussion occurred in the context of the ALJ's obligation to give "good reasons" for not crediting a treating physician's opinion, but the same logic applies here.

[11] Remand on this basis is a close call.  It is entirely possible that, as Respondent posits, the ALJ "gave Plaintiff the benefit of the doubt" by concluding he is blind in one eye despite having rejected all the evidence supporting that diagnosis.  (Def. Mem. at 16 n.6.)  Plaintiff could hardly be heard to complain about such a concession.  But no such concession is articulated in the ALJ's decision, so we are left with an anomaly which – so long as it is left unexplained – undermines confidence in the ALJ's reasoning.  See Tolany v. Heckler, 756 F.2d 268, 272 (2d Cir. 1985)(remanding in part to permit clarification of "implicit" and "unarticulated" elements of ALJ's reasoning).

[12] I agree with Defendant that the ALJ did not err in failing to develop the record regarding various aspects of the doctors' opinions.  (Def. Mem. at 21 n.11.)  However, upon reevaluation of the record and plaintiff's abilities on remand, the ALJ may choose to seek further

plaintiff's visual impairment, the ALJ should take care to avoid incorporating opinions or medical findings that he elsewhere disavows.

2.  Non-Medical Sources

    a.  Plaintiff's Father

Plaintiff asserts that the ALJ improperly "does not believe the father's testimony regarding his son's abilities, accepting instead what the claimant said in his written function report, although the testimony and the notes of the treating psychologist confirm that Rogers is prone to exaggerating his own capability." (Pl. Mem. at 12.)

Under SSR 96-7P, the ALJ "must consider the entire case record, including . . . statements and other information provided by treating or examining (sources) and other persons about the symptoms and how they affect the individual."  20 CFR 404.1513(d)(4) states that "other sources include but are not limited to . . .spouses, parents and other caregivers, siblings, other relatives, friends, neighbors and clergy."  20 CFR 404.1527(c)(3)-(4); 20 CFR 404.1513(d); SSR 06-0eP, 2006 WL 2329939 at *2, *5-6 (SSA Aug. 9, 2016).

Upon consideration of plaintiff's father's testimony, the ALJ explained that Mr. Rogers Sr.

> [t]estified that his child was so mentally deficient that he was able to do practically nothing - that even making a sandwich would be difficult for him. Even holding a bag for his father to put leaves into was impossible because of debilitating gross motor skills.  This testimony was evaluated by the undersigned as being highly exaggerated and totally inconsistent with any of the objective medical evidence.  Accordingly . . . the claimant's father was generally an unreliable witness."

(R. 17 n.6.)  The ALJ further explained that plaintiff's father "gave highly exaggerated testimony

---

clarifying information from plaintiff's doctors.

at the hearing while describing the claimant's medical conditions and functional limitations. He asserted that the claimant was essentially incapable of functioning independently and suffered from debilitating gross motor skill deficits – facts not established by the overall medical record and specifically contradicted by the claimant's work history." (R. 18.)

The ALJ gave proper consideration to plaintiff's father's testimony and, in light of the ALJ's aforementioned analysis of plaintiff's own testimony, permissably found plaintiff's father to be a non-credible witness.

      b.   <u>Ms. Baruch</u>

Plaintiff argues that the ALJ improperly "[d]id not believe statements or opinions from Rogers' vocational consultant, Ms. Baruch, stating they are based on non-credible statements made by plaintiff and his father and further denigrates the vocational evaluation because it was based on a telephone interview." (Pl. Mem. at 12.) He argues that the "ALJ failed to properly evaluate the third-party statement[] made by . . . [the] vocational consultant" and that "the ALJ's outright disbelief of [this] corroborative source[] and the concomitant disbelief of Rogers without further explanation is a clear error of law and evinces a predetermined outcome by ALJ Katz." (<u>Id.</u> at 19.)

Defendant argues that the ALJ "appropriately discounted VE Baruch's opinion because it was primarily based on her uncritical acceptance of the interviews of plaintiff's parents, which the ALJ found to be not credible, rather than based on plaintiff's interview delineating his many functional abilities." (Def. Mem. at 20).

The ALJ detailed Ruth Baruch's August 2013 vocational assessment. Despite plaintiff's report to Ms. Baruch that he went to the gym, used the computer, went to the library, enjoyed "watching sports, writing, or very occasionally going out with a friend," drove locally, and

obtained a high school diploma, Bachelor's degree in media communications and a Master's

degree in Journalism, Ms. Baruch opined that plaintiff's "multitude of limitations including his

significant visual and communication deficits, gait disturbances, low stamina, difficulty dealing

with feedback and emotional liability" would prohibit him from being "able to maintain

competitive employment." (R. 263-66.). The ALJ explained that he

> accords no weight to the opinions of Ms. Baruch as they are not based on an in-
> person function-by-function evaluation of the claimant's functional abilities. In
> addition, she appears to have relied heavily on the subjective report of symptoms
> and limitations provided by the claimant's parents; she uncritically accepted as
> true most, if not all, of what was reported. The claimant's parents are not
> medical professionals and accordingly are not competent to make a diagnosis of
> the severity of the claimant's symptoms.

(R. 17-18.)

The ALJ's explanation of his choice to accord no weight to Ms. Baruch's opinion is

thorough and reasonable and does not amount to the "clear error of law" that plaintiff asserts.

c.      Mr. Heneghan

Plaintiff complains that "the ALJ Decision also fails to give the required explanation as

to why he gave little weight to the employer's written statement, and found it less than fully

credible." (Pl. Mem. at 20.)    The ALJ explained that he "accords little weigh to [Mr.

Heneghan's] opinion, as it is internally inconsistent with Mr. Heneghan's statement that the

claimant exhibited impressive determination and commitment in his work, was always punctual,

accepted new work assignments eagerly, received criticism and instruction, and was liked by his

fellow employees." (R. 18.) The ALJ further explained that Mr. Heneghan's "opinion does not

take into account that the claimant had a 10 year, successful work relationship with the firm and

lost his job only because of non-medical reasons (a downsizing)." (Id.) Further, the ALJ noted

that Mr. Heneghan's report of claimant's team's responsibilities and plaintiff's "performance of

such responsibilities for the length of time the claimant worked demonstrates that he is not impaired to the extent alleged; in addition, there is no medical evidence that his overall condition deteriorated since he stopped working." (Id.)

I find that, as with the ALJ's assessment of the other third party sources, the ALJ satisfied his responsibility of considering non-medical sources and made a reasoned decision to accord little weight to Mr. Heneghan's letter.

3.      Evaluation of all Claimed Impairments

a.      Psychiatric Impairment

Plaintiff contends that the ALJ should have considered plaintiff's psychiatric impairment of a dysthymic disorder to be severe. (Pl. Mem. at 20.) Plaintiff claims that medical and lay evidence support plaintiff's emotional problems, even though he admits that the "functional impact is somewhat unclear." (Id. at 21.) Plaintiff relies on Drs. Jordan and Carway's "unsolicited statement about Rogers being unable to maintain concentration" as support for the severity of plaintiff's disorder. (Id.)

Here, the ALJ reasonably found that plaintiff's dysthymic disorder was not a severe impairment because it did not significantly limit his capacity to perform basic work activities. (R. 12.) The ALJ engaged in a multi-step analysis of the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1) (R. 12-13). As part of this process, the ALJ evaluated plaintiff's activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation in concluding that plaintiff's mental impairment causes is non-severe. The ALJ credited plaintiff's explanation of his abilities in a Function Report from September 26, 2012, upon which, as explained above, the ALJ reasonably relied. In this report,

plaintiff indicated that he had no problems paying attention, can finish what he starts, has no problems getting along with authority figures and has never lost a job due to problems getting along with others, and that stress does not affect him.  (R. 175-76.)  As explained above, the ALJ also fairly discounted the opinions of Dr. Carway, the only mental health professional in the record, whose findings plaintiff's counsel even submits are "admittedly inconsistent with his findings and the totality of the evidence," and Dr. Jordan, the ophthalmologist who noted plaintiff's inattentiveness during the eye examination.  (R. 270.)

Overall, I do not find that the ALJ erred in finding plaintiff's dysthymic disorder to be non-severe, and I disagree with plaintiff that the ALJ failed to properly evaluate this impairment.

b.      Exertional Limitation

Additionally, plaintiff claims that the ALJ erred in excluding any exertional limitations, such as impairment of gross motor skills, in the RFC.  (Pl. Mem. at 21-22.)  As explained above, the ALJ fairly discounted the testimony of plaintiff's father concerning his exertional impairments.  Furthermore, ophthalmologist Dr. Jordan's comment that she was "fully aware of [plaintiff's multiple impairments, including . . . gross motor skills" is certainly not evidence in itself of any severe exertional limitation.  (R. 270.)  I disagree with plaintiff that the ALJ erred in failing to include exertional limitations in the RFC.

B.      The ALJ's Finding That Plaintiff Could Perform his Past Relevant Work and Other Jobs in the National Economy

Plaintiff claims that the ALJ improperly relied upon the testimony of the vocational witness that there were jobs in the national economy that plaintiff could perform.  (Pl. Mem. at 22-24.)

1.    Special Circumstances

First, plaintiff alleges that his past work was performed under special circumstances.

Plaintiff argues that the ALJ improperly "[r]efused to accept that Rogers' work was performed

under 'special circumstances' despite testimony by the claimant and his father and written

statements by the employer and a vocational expert."  (Pl. Mem. at 12).  He claims that the

ALJ's "determination that Rogers can perform 'past relevant work' is a straw man" and that

"even if Rogers['s] work was not performed under special circumstances, the work that he was

found capable of doing by the vocational witness was not the work he actually performed!"  (Id.

at 15.)

Defendant notes that, "[a]t the hearing, the only work accommodation plaintiff reported

receiving was help in explaining the process to him, an accommodation which the ALJ correctly

found conflicted with other portions of the medical record; at other times, plaintiff did not report

receiving any accommodations."  (Def. Mem. at 14.)  Furthermore, Defendant states that the

"overall record reveals that on numerous occasions plaintiff failed to mention receiving any

accommodations at work, the only time he mentioned receiving any accommodations, they

appeared to be minimal."

If "work is done under special conditions," such as being "given the opportunity work

despite [an] impairment because of family relationship, past association with [an] employer, or

[the] employer's concern for [the claimant's] welfare," the Social Security Administration "may

find that [the] work does not show that [the claimant is] able to do substantial gainful activity.

However, work done under special conditions may show that [the claimant has] the necessary

skills and ability to work at the substantial gainful activity level."  20 C.F.R. § 404.1573; Moran

v. Astrue, 569 F.3d 108, 114 (2d Cir. 2009).

Unlike <u>Moran</u>, in which the ALJ erroneously failed entirely to refer to a medical report suggesting that the claimant's work was gradually curtailed as a result of his disabilities, the ALJ in this case gave a thorough explanation of his decision not to consider plaintiff's work as having been done under special conditions.  The ALJ described Mr. Heneghan's letter which summarized plaintiff's work performance and the ways in which Mr. Heneghan's firm accommodated plaintiff and, as explained above, the ALJ also articulated his reasons for not according weight to the opinion.  (R. 18.)  The ALJ noted that though plaintiff "claimed that his employer (his cousin) accommodated him and made allowances for his 'slowness,'" such accommodation was not documented in the record.  (R. 15.)  Here, the ALJ performed sufficient analysis of the conflicting evidence regarding the existence of special circumstances at plaintiff's previous position and reasonably declined to find that plaintiff's work was done under special conditions.

2.     Conflict Between the DOT and the Vocational Expert's Testimony

The ALJ enlisted the assistance of a vocational expert and posed hypotheticals to him to identify jobs that an individual with plaintiff's vocational profile could perform and the incidence of such jobs in the national economy.  (R. 62-73.)  Plaintiff asserts that there is a conflict between the  Dictionary of Occupational Titles for either the brokerage or accounting clerk position[13] and VE Smith's testimony, because the DOT states that both positions require use of near acuity, which plaintiff claims to lack.  (Pl. Mem. at 16.)  Defendant asserts that,

---

[13]  Plaintiff initially asserts that the ALJ erred in accepting the testimony of the vocational witness that plaintiff worked as a brokerage clerk, when plaintiff and his employer note that he was an accounting assistant and the other vocational specialist deemed him an accounts receivable clerk.  (Pl. Mem. at 14).  I decline to address this conflict because plaintiff concedes that "that is not the real problem here, for as the Commissioner correctly points out, the demands and functions of the two jobs are actually quite similar."  (Pl. Reply at 2).

because substantial evidence supports plaintiff's ability to perform visual tasks involving near

acuity, and therefore both the DOT and the VE's testimony assumed plaintiff's ability to engage

in tasks involving near acuity, there is no conflict between the DOT and the vocational expert's

testimony. (Def. Mem. at 24-25.)  As explained above, I do not find that the ALJ's assessment

of Drs. Jordan, Rathi, and Johnston's medical findings and opinions regarding plaintiff's visual

capacity comport with the ALJ's RFC determination as articulated.  Therefore, it is impossible to

assess whether the hypotheticals posed to the Vocational Expert were based on plaintiff's true

abilities.  If, upon further analysis of the medical evidence of plaintiff's visual limitations, the

ALJ finds that plaintiff's RFC encompasses a limitation other than what is into his current RFC

determination, the ALJ should pose new hypothetical questions to the vocational expert based on

the revised RFC.

C.    Post-Onset Earnings

        Plaintiff argues that the ALJ erred in his refusal "to accept that post-onset earnings were

due to a severance package despite the statement by the employer and absolutely no evidence to

the contrary."  (Pl. Mem. at 12.)  Defendant responds that "[w]hether or not plaintiff engaged in

[substantial gainful activity] through the first quarter of 2012 as the ALJ found or stopped

working in June 2011 and subsequently received income as part of a 'buy out' termination offer

as plaintiff claims, is not material, as the ALJ found in the alterative that plaintiff was not

disabled even assuming he had not performed [substantial gainful activity] since June 2011."

(Def. Mem at 23-24) (internal citations omitted).

        If the ALJ's determination of plaintiff's disability changes on remand, the ALJ should

analyze plaintiff's post-June 2011 income in light of Mr. Heneghan and plaintiff's statements

that the payments were part of a severance package.

## VI. CONCLUSION

For the reasons set forth below, I respectfully recommend that defendant's motion be **DENIED**, and that plaintiff's motion be **GRANTED** to the extent that the case is **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings.

Dated: August 15, 2016
       White Plains, New York

Respectfully submitted,

Paul E. Davison, U.S.M.J.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to serve and file written objections.  See also Fed. R. Civ. P. 6(a).  Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Cathy Seibel, at the Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.